**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **LEONARDO "LEO" ALDRIDGE**<br><br>Plaintiff,<br><br>v.<br><br>**TELEVICENTRO OF PUERTO RICO LLC, D/B/A WAPA MEDIA GROUP**<br>**WAPA HOLDINGS, LLC**<br>**INTERMEDIA ESPANOL, INC.**<br>**ABC CORPORATION**<br>**INSURANCE COMPANY XYZ**<br>**JOHN DOE**<br><br>Defendants. | **CIVIL NO.:**<br><br>Damages, Defamation, Vicarious Liability<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

**TO THE HONORABLE COURT**:

**COMES NOW**, Plaintiff Leonardo "Leo" Aldridge ("Plaintiff"), through his undersigned counsel, and files this Complaint against the Defendants identified below, and respectfully alleges as follows:

## I. INTRODUCTION

1. This is a civil action for reputational harm, intentional infliction of emotional distress, defamation, and premises liability arising from a deliberate and publicly broadcasted verbal attack against Plaintiff Leonardo Aldridge, a prominent federal criminal defense attorney, political analyst, and public commentator, carried out by a radio personality on live air at the facilities of Defendant Televicentro of Puerto Rico, LLC, d/b/a WAPA TV and WAPA Media Group ("WAPA"), on August 29, 2025.

2. The attack was not a matter of public debate, journalistic commentary, or political disagreement. It was a personal, premeditated, and gratuitous assault on Plaintiff's honor and reputation, shouted while the microphones were live and broadcasting to WAPA's full audience (a fact both the radio personality and the Defendant were well aware of), and subsequently amplified across every major media platform in Puerto Rico. It left an indelible and involuntary mark on Plaintiff's public identity: one built over decades of rigorous professional achievement, public engagement, and exemplary conduct in the legal, academic, and media spheres.

3. The harm inflicted upon Plaintiff implicates values of the highest constitutional and human dimension. As the Supreme Court of the United States has recognized, the right of every person to the protection of their own reputation from unjustified invasion and wrongful hurt reflects nothing less than our most basic conception of the essential dignity and worth of every human being. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974). The individual's right to the protection of his good name is not a peripheral interest. It is a basic consideration of our constitutional order, enshrined in the law of torts, in the law of defamation, and explicitly in the Constitution of Puerto Rico, which guarantees every person the right to protection against abusive attacks on their honor and reputation. *See* P.R. CONST. ART. II, § 8.

4. The First Amendment undoubtedly protects robust, spirited, and even harsh public debate on matters of public concern. But the Supreme Court has never held that freedom of expression includes a license to inflict reputational injury through deliberately offensive and dishonoring public attacks. The statements at issue here, vulgar, targeted, and entirely devoid of any informational, journalistic, or public interest value, fall nowhere within the shelter of the First Amendment. They were not speech. They were a violent assault, carried out with a microphone.

5. Plaintiff does not bring this action lightly, nor does he seek to silence public discourse or inhibit legitimate media activity. To the contrary, as an attorney who appears regularly in federal and state courts, as a commentator who has engaged with Puerto Rico's most pressing political and legal questions for over a decade, and as a public figure who has consistently subjected himself to the scrutiny and criticism that public life entails, Plaintiff understands and respects the essential role of a free press and open public debate. What Plaintiff seeks here is not the suppression of speech, but the vindication of rights through the institutional mechanisms that a constitutional democracy makes available precisely for this purpose: the courts, the rule of law, and the orderly process of civil justice.

6. WAPA, as the licensed broadcast entity that employed the individual responsible for this attack, provided him with unrestricted access to its facilities, and broadcast his words to a mass public audience through its own signal, bears full legal responsibility for the harm caused. Plaintiff respectfully invokes the jurisdiction of this Court and asks that justice be done.

## II. PARTIES

### A. Plaintiff Leonardo Aldridge: Professional Background and Legal Career

7. Plaintiff Leonardo "Leo" Aldridge is of legal age, a licensed attorney, political analyst, and resident of Bayamon, Puerto Rico. His physical and mailing address is 1225 Ave. Ponce de León, Suite 1501, San Juan, PR 00907.

8. Plaintiff holds a Bachelor of Arts in Economics from Boston College (2002), a Juris Doctor from the University of Puerto Rico School of Law (2010), and a Master of Laws (LL.M.) in Trial Advocacy from James E. Beasley School of Law at Temple University (2016), all conferred with Honors.

9. Plaintiff is admitted to the practice of law in the Commonwealth of Puerto Rico and in the State of New York, where he has maintained good standing and an unblemished professional record for more than 15 years.

10. Plaintiff is a member of the Criminal Justice Act (CJA) Panel for the United States District Court for the District of Puerto Rico, and the Southern District of New York. Membership on the CJA Panel is a merit-based appointment extended only to attorneys who have demonstrated a high level of legal competence, professional integrity, and courtroom experience, and who have been vetted and approved by the federal judiciary.

11. As a CJA Panel attorney, Plaintiff is appointed by federal judges to represent indigent defendants in federal criminal proceedings, a role that demands an unwavering standard of professional conduct, sound legal judgment, and a reputation above reproach, both before the Court and in the public sphere.

12. Plaintiff's legal practice focuses primarily on federal criminal defense. He has represented thousands of clients before the United States District Court for the District of Puerto Rico, the Southern and Eastern Districts of New York, the District of Massachusetts, and the District of the United States Virgin Islands.

13. Plaintiff's professional recognition extends to the academic sphere, where he has served as a lecturer, panelist, and speaker at the university level. In this capacity, Plaintiff has engaged with academic audiences on topics at the intersection of law, politics, and public affairs, further cementing his standing as a respected and authoritative voice within Puerto Rico's intellectual and professional community.

14. Over the course of his legal career, Plaintiff has cultivated a reputation for rigorous advocacy, professional seriousness, and ethical integrity, qualities that form the foundation of client trust, judicial confidence, and peer respect within the legal community.

**B. Plaintiff's Standing as a Political Analyst and Media Commentator**

15. Beyond his legal practice, Plaintiff Leo Aldridge is a widely recognized public intellectual and media figure in Puerto Rico. For more than 20 years, he has served as a frequent political analyst and commentator on Puerto Rico's leading television and radio programs, offering legal and political analysis on matters of public interest.

16. Plaintiff is currently a regular commentator on *Rayos X*, a prominent investigative journalism and political and legal analysis program broadcast on Telemundo Puerto Rico, where he appears frequently to provide expert legal and political commentary before a wide television audience.

17. Prior to his current role on *Rayos X*, Plaintiff appeared as a commentator on other well-known and widely followed Puerto Rico media programs, including *Jugando Pelota Dura*, establishing a long and consistent track record of media engagement spanning multiple platforms, programs, and audiences.

18. Plaintiff is a regular columnist for *El Nuevo Día*, Puerto Rico's leading and most widely circulated newspaper. His columns address political, legal, and public policy matters, and are read by members of the general public, legal professionals, government officials, and members of the media community across Puerto Rico and beyond.

19. Plaintiff is also a regular presence on Puerto Rico radio, appearing as a political and legal analyst across multiple radio stations. Most notably, Plaintiff has served as a guest analyst on *WKAQ Analiza*, the flagship political analysis program of WKAQ radio, for approximately

fifteen years. During that period, Plaintiff has regularly substituted for the program's regular hosts when absent due to vacation, professional commitments, or personal matters, a role that reflects the trust, credibility, and professional stature that the station and its producers have placed in him over more than a decade of consistent collaboration.

**C. The Reputational Capital Plaintiff Has Built Over Decades**

20. Plaintiff's professional reputation is the product of decades of deliberate and sustained effort across two distinct but reinforcing spheres: the practice of law and public media engagement. In both spheres, his credibility rests on a single indispensable foundation: the public's trust in his integrity, professionalism, judgment, and good name.

21. In the legal sphere, Plaintiff's reputation directly affects his ability to attract and retain clients, to be entrusted with federal court appointments, to command professional respect from judges and opposing counsel, and to maintain the standing required to practice law at the highest levels in both Puerto Rico and abroad.

22. In the media sphere, Plaintiff's reputation as a serious, credible, and authoritative analyst determines his ability to secure and maintain television and radio engagements, to be sought after as a commentator on politically sensitive matters, and to sustain his role as a newspaper columnist whose views are taken seriously by readers, editors, and public officials.

23. The two spheres are mutually reinforcing: Plaintiff's stature as a practicing attorney lends weight to his media commentary, while his public media presence elevates his professional visibility and reputation within the legal community. Damage to his reputation in either sphere necessarily, and foreseeably, causes harm in both.

24. Plaintiff has an unblemished professional record: he has never been the subject of disciplinary proceedings or any finding of conduct unbecoming of a member of the bar or a public media figure.

25. Prior to the events described herein, Plaintiff enjoyed a well-established and unblemished professional reputation, recognized both within Puerto Rico's legal and political communities and by the general public that follows his commentary and legal work.

26. Plaintiff's professional reputation constitutes a tangible and valuable asset, the product of years of investment, discipline, and public engagement. Any harm to that reputation, particularly harm resulting from a public association with offensive, vulgar, or disreputable conduct, translates directly and foreseeably into professional, economic, and personal injury.

**D. Defendant WAPA**

27. Defendant Televicentro of Puerto Rico, LLC, doing business as WAPA, WAPA TV and WAPA Media Group (hereinafter "WAPA"), is a for-profit foreign limited liability company organized under the laws of the State of Delaware on August 26, 1999, and authorized to conduct business in the Commonwealth of Puerto Rico under registration number 109, as reflected in the records of the Puerto Rico Department of State's Corporations Registry. WAPA's principal physical address in Puerto Rico is Ave. Luis Vigoreaux, Puerto Rico State Road No. 19, Km. 0.5, Guaynabo, PR 00966, and its postal address is P.O. Box 362050, San Juan, PR 00936. According to its restated certificate of authorization on file with the Puerto Rico Department of State, WAPA's principal corporate office is located at 4000 Ponce de León Boulevard, Suite 650, Coral Gables, FL 33146, and its designated resident agent for service of process in Puerto Rico is Corporation Service Company Puerto Rico, Inc., c/o RVM Professional Services, LLC, A4 Reparto Mendoza, Humacao, PR 00791.

28. At all times relevant to this action, WKAQ 580 AM, the radio station on whose premises and live broadcast the incident described herein occurred, operated as part of WAPA's portfolio of licensed broadcast properties under the WAPA Media Group umbrella. Journalist Rubén Sánchez was, at all relevant times, an employee of WAPA.

29. Rubén Sánchez is one of Puerto Rico's most prominent and widely recognized radio personalities. At all times relevant to this action, Sánchez was employed by WAPA as the anchor and host of *Temprano en la Mañana*, the morning drive program broadcast on WKAQ 580 AM, and as host of *La Entrevista de Frente*, a political interview program on the same station. Sánchez leads his time slot in audience share within the Puerto Rico radio market, commanding one of the largest audiences on the island. His programs air during the highest-traffic hours of the broadcast day, ensuring that his voice and the content of his broadcasts reach tens of thousands of listeners in real time. It was Sánchez, acting as WAPA's employee, on WAPA's premises, using WAPA's credentials, and on WAPA's live broadcast signal, who carried out the attack on Plaintiff described herein.

**E. Defendants WAPA Holdings, LLC and InterMedia Espanol, Inc.**

30. Defendant WAPA Holdings, LLC ("WAPA Holdings") is a limited liability company with FCC Registration Number 0016353955 and principal offices at 4000 Ponce de Leon Blvd., Suite 650, Coral Gables, Florida 33146, the address disclosed in its filings with the Federal Communications Commission ("FCC"). According to the Commercial Broadcast Stations Biennial Ownership Report (FCC Form 323) filed with the FCC on November 29, 2023, File No. 0000228830 (the "FCC Ownership Report"), WAPA Holdings holds one hundred percent (100%) of the voting and equity interests of Defendant InterMedia Espanol, Inc. and is, through that

interest, an owner and controlling entity of the broadcast stations operated under the WAPA Media Group umbrella, including WKAQ 580 AM.

31. Defendant InterMedia Espanol, Inc. ("InterMedia") is a for-profit Delaware corporation with FCC Registration Number 0016353963 and principal offices at 4000 Ponce de Leon Blvd., Suite 650, Coral Gables, Florida 33146, the address disclosed in the FCC Ownership Report. According to the FCC Ownership Report, InterMedia holds an attributable interest in the licensees of the WAPA Media Group broadcast stations, including Defendant Televicentro of Puerto Rico, LLC, licensee of WAPA TV, and WLII/WSUR License Partnership, G.P., licensee of WKAQ 580 AM, the station at whose studios and on whose live broadcast signal the events described in this Complaint occurred.

32. Upon information and belief, WAPA Holdings and InterMedia, directly and/or through intermediary limited liability companies, own, direct, control, and derive economic benefit from the operations, personnel, facilities, credentialing, programming, and broadcast platforms of WAPA and of WKAQ 580 AM, including the employment, retention, and supervision of Rubén Sánchez. All references in this Complaint to the acts, omissions, duties, and liability of WAPA are also asserted against WAPA Holdings and InterMedia, which are jointly and severally liable to Plaintiff, under Articles 1536 and 1540 of the Puerto Rico Civil Code of 2020, for the damages alleged herein, whether directly, vicariously, or in their capacity as owners and controlling entities of the WAPA enterprise.

33. For purposes of diversity jurisdiction, WAPA Holdings is a citizen of the states of Delaware and Florida inasmuch as, according to other FCC Ownership Reports filed on November 29, 2023, WAPA Holdings is a wholly owned subsidiary of Hemisphere Media Holdings, LLC, who, in turn, is a wholly owned subsidiary of HMTV, LLC, who, itself, is a wholly owned

subsidiary of Hemisphere Media Group, Inc., a for-profit Delaware corporation with FCC Registration Number 0022806053 and principal offices at 4000 Ponce de Leon Blvd., Suite 650, Coral Gables, Florida 33146.

**F. Other Defendants**

34. Defendant ABC Corporation is a business entity of unknown form and citizenship whose true name and identity are presently unknown to Plaintiff and will be confirmed through discovery. Upon information and belief, ABC Corporation is a joint tortfeasor that bears concurrent and independent liability for some or all of the damages suffered by Plaintiff as described herein, whether as direct employer, operator, contractor, affiliated entity, or in any other capacity to be confirmed through discovery, and is jointly and severally liable for the full measure of damages described herein. Plaintiff reserves the right to amend this Complaint to substitute ABC Corporation's true name and identity, and to assert such additional theories of liability as the facts confirmed through discovery may warrant.

35. Defendant Insurance Company XYZ is an insurance carrier of unknown identity whose true name will be confirmed through discovery. Upon information and belief, Insurance Company XYZ issued one or more insurance policies covering some or all of the acts, omissions, and damages described herein, whether issued in favor of Defendant WAPA, Defendant WAPA Holdings, Defendant InterMedia, Defendant ABC Corporation, Rubén Sánchez, John Doe, or any other defendant named herein, and is directly liable to Plaintiff for the damages recoverable under such policy or policies. Plaintiff reserves the right to amend this Complaint to substitute Insurance Company XYZ's true name and identity upon confirmation through discovery.

36. Defendant John Doe is an individual whose true name and identity are presently unknown to Plaintiff and will be confirmed through discovery. Doe bears individual responsibility,

whether by act, omission, or participation, for some or all of the damages suffered by Plaintiff as described herein. Plaintiff reserves the right to amend this Complaint to substitute John Doe's true name and identity upon confirmation through discovery.

## III. <u>JURISDICTION AND VENUE</u>

37. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), which confers original jurisdiction upon federal district courts over civil actions between citizens of different states where the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

38. Plaintiff is a citizen of the Commonwealth of Puerto Rico for purposes of diversity jurisdiction. Defendant Televicentro of Puerto Rico, LLC, d/b/a WAPA TV and WAPA Media Group, is a limited liability company organized under the laws of the State of Delaware. For purposes of diversity jurisdiction, a limited liability company takes the citizenship of each and every one of its members, not the state of its incorporation. *See Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc.*, 435 F.3d 51, 54 (1st Cir. 2006) (noting that "every circuit to consider this issue has held that the citizenship of a limited liability company is determined by the citizenship of all of its members"); *BRT Mgmt. LLC v. Malden Storage LLC*, 68 F.4th 691, 696 (1st Cir. 2023) ("an LLC is subject to this rule and takes the citizenship of all of its members"); *Berkley Nat'l Ins. Co. v. Atl.-Newport Realty LLC*, 93 F.4th 543, 549 (1st Cir. 2024) (LLC has "the citizenship of all of the members of each company")(internal quotation marks omitted).

39. Upon information and belief, Hemisphere Media Group, Inc. (hereinafter "HMTV") is the sole member of Defendant Televicentro of Puerto Rico, LLC. HMTV is a Delaware corporation with its principal place of business in the State of Florida. Accordingly,

complete diversity of citizenship exists between Plaintiff (a citizen of Puerto Rico) and Defendant Televicentro of Puerto Rico, LLC, within the meaning of 28 U.S.C. § 1332(a)(1) and controlling First Circuit precedent.

40. Upon information and belief, neither Defendant WAPA Holdings nor Defendant InterMedia is a citizen of Puerto Rico. InterMedia is a for-profit corporation organized under the laws of a state other than Puerto Rico with its principal place of business in Coral Gables, Florida. WAPA Holdings is a limited liability company whose members, upon information and belief, are citizens of states other than Puerto Rico. Accordingly, the joinder of WAPA Holdings and InterMedia does not defeat the complete diversity of citizenship that exists between Plaintiff and all Defendants within the meaning of 28 U.S.C. § 1332(a)(1).

41. The amount in controversy exceeds $75,000.00, exclusive of interest and costs, as the damages suffered by Plaintiff, including reputational harm, economic losses, mental anguish, and emotional distress, substantially exceed that threshold amount.

42. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events and omissions giving rise to the claims asserted herein occurred within the District of Puerto Rico.

## IV. FACTUAL ALLEGATIONS

### A. The Incident of August 29, 2025

43. On the morning of August 29, 2025, Plaintiff was invited to appear as a guest legal and political analyst on *WKAQ Analiza*, the flagship political analysis program of WKAQ 580 AM, in substitution for regular co-host Attorney Luis Pabón Roca, who was absent that day. Plaintiff arrived at the WKAQ 580 studios at approximately 8:20 a.m., and the live broadcast

commenced at 8:30 a.m., as customary. Plaintiff was on air alongside Attorney Carlos Díaz Olivo, the program's co-host.

44. In the early minutes of the broadcast, Rubén Sánchez, whose own morning program, *Temprano en la Mañana*, had just concluded on the same station, walked through a hallway adjacent to the broadcast booth. As he passed, Sánchez looked directly at Plaintiff through the booth and directed an obscene hand gesture at him, extending his middle finger toward Plaintiff in a deliberate and hostile manner.

45. Following this initial act of aggression, Plaintiff and Sánchez exchanged a series of text messages. In those messages, Sánchez's hostility toward Plaintiff was further manifested, including a message in which Sánchez referred to Plaintiff with the same vulgar epithet he would, moments later, direct at him on live air.

46. While the broadcast of *WKAQ Analiza* continued live on air, Sánchez used his station credentials to open the door of the broadcast booth and forcibly entered the studio completely uninvited. Once inside, and while the microphones were live and broadcasting to WKAQ 580's full audience, Sánchez shouted directly at Plaintiff, in rapid succession: *"Tú eres un pendejo"*, *"No te metas conmigo", "Pendejo", "No te metas conmigo", "Pendejo", "En la cara".*[1] The station immediately cut to a long commercial break while Sánchez quickly exited the studio.

47. Sánchez's conduct was not the product of a spontaneous outburst. It was a deliberate, malicious, and premeditated act of aggression, preceded by the middle finger gesture in the hallway and the hostile text message exchange, carried out against an invited guest who was

[1] "You're an asshole", "Don't mess with me", "Asshole", "Don't mess with me", "Asshole", "In your face" (Translation ours).

present at the station's premises in a professional capacity, during a live broadcast, using station credentials and station facilities to gain entry to the booth.

48. Upon returning from the commercial break, WKAQ 580's Content Director, Joel Lago Román, addressed the audience on air and publicly apologized to both the listening audience and to Plaintiff personally, stating that Sánchez's expressions *"do not represent the position of this station"* and characterizing them as *"bochornosas"* (shameful). Attorney Carlos Díaz Olivo likewise apologized on air to Plaintiff and to the audience for what had occurred in his program.

49. Plaintiff, having been publicly insulted on live radio at the very station that had repeatedly invited him as a trusted guest analyst for approximately fifteen years, announced on air his decision to withdraw from the program following the incident, stating: *"I believe the most appropriate thing to do, after receiving an insult from Rubén Sánchez on air, is to leave, because this is evidently not correct."* (Translation ours).

50. Plaintiff left the WKAQ 580 studios shortly thereafter.

**B. Media Coverage of the Incident**

51. The incident was covered immediately and extensively by Puerto Rico's principal news organizations on the very day it occurred, August 29, 2025, and continued to generate sustained media coverage for weeks thereafter.

52. Among the print and digital news outlets that covered the incident on the date it occurred or within the following days were *El Nuevo Día*, Puerto Rico's largest and most widely circulated newspaper, *Primera Hora*, *Metro Puerto Rico*, *NotiCel*, and *El Vocero*, among others, which published multiple articles covering the incident and its aftermath. The incident was covered by no fewer than ten major news outlets on the date it occurred alone, with coverage documented through at least September 22, 2025.

53. The incident was likewise covered across Puerto Rico's major broadcast television networks on the same day. *WAPA TV* covered the incident on its program *Lo Sé Todo*, reporting that the incident had generated immediate reactions. *Telemundo Puerto Rico* covered the incident on its program *Día a Día*. *TeleOnce* covered the incident through its program *PR En Vivo*.

54. The incident generated immediate and widespread coverage across Puerto Rico's radio landscape as well. Molusco, one of Puerto Rico's most prominent radio personalities, addressed the incident on his program *La Tendencia de Molusco* on KQ 105. The incident was additionally covered on *La Mega 106.9 FM*, where it was discussed on the program *El Circo*.

55. Prominent media personalities also covered the incident across their digital platforms. Jay Fonseca, one of Puerto Rico's most followed media figures and consistently identified as Puerto Rico's most influential opinion maker, addressed and shared the incident across his digital platforms. Puerto Rico's top political commentary podcast and digital platform *Puestos Pa'l Problema* also covered the incident.

56. The sustained media coverage of the incident spans a documented period of at least twenty-four days, with articles and broadcasts confirmed on August 29 and 30, on September 2, 4, 8, 11, 13, and 17, and on September 22, 2025, the date of Sánchez's return to public air.

### C. Virality, Public Discussion, and Reputational Impact

57. The incident of August 29, 2025 generated the widest and most sustained media coverage that Plaintiff has ever received across all platforms and outlets, not as a result of his own professional achievements, but as the unwilling subject of a vicious, ill-intentioned and uninvited public attack that forcibly and permanently associated his name and professional image with the offensive and vulgar statements of Rubén Sánchez.

58. Articles published by *El Nuevo Día*, *Primera Hora*, *Metro Puerto Rico*, *NotiCel*, *El Vocero*, *Puerto Rico Posts*, and other outlets covering the incident became among the most-read articles on each outlet's respective website on August 29, 2025, and in the days that followed.

59. Videos published on YouTube and other digital video platforms documenting the incident, including recordings of the live broadcast and commentary by media personalities, accumulated tens of thousands of views within days of the incident. These videos remain publicly accessible and continue to circulate, ensuring the ongoing and indefinite association of Plaintiff's name and professional image with the offensive statements made by Sánchez.

60. Posts, shares, and commentary concerning the controversy generated hundreds of thousands of impressions and tens of thousands of engagements across social media platforms, including X, Facebook, Instagram, and YouTube. The incident was disseminated in real time via the official social media accounts of WKAQ 580, as well as through the personal accounts of media personalities, public officials, and members of the general public, ensuring instantaneous and widespread public exposure to the offensive statements directed at Plaintiff.

61. Following the incident, searches for Plaintiff's name on Google and other internet search engines reached their highest recorded level during any period relevant to this action. The incident constitutes, by every available metric of digital reach and public engagement, including pageviews, video views, social media impressions, engagements, and internet search volume, the single most-viewed, most-searched, and most-discussed event ever publicly associated with Plaintiff's name. This association was created not by Plaintiff's own conduct or professional activity, but solely and directly as a result of Sánchez's actions on August 29, 2025.

62. The reputational harm inflicted upon Plaintiff was not confined to the media sphere. In the weeks and months following the incident, Plaintiff was approached and questioned about

the incident by members of the public in a wide range of settings, on the street, in restaurants, at social gatherings, in airports, at radio stations, and in courthouse hallways, demonstrating that the incident penetrated not only the media landscape but the daily professional and personal life of Plaintiff, leaving an indelible and involuntary mark on his public identity. In fact, while conducting voir dire as a criminal defense attorney, Plaintiff was recognized by a prospective juror in the Court of First Instance, Fajardo Part, as the person who had been violently attacked on WAPA's premises.

63. The magnitude and persistence of the reputational harm caused to Plaintiff is further confirmed by the events of September 22, 2025, nearly four weeks after the incident, when Sánchez returned to air on *Temprano en la Mañana* after more than two weeks off the air, and opened his program by reading a formal public statement of apology directed at Plaintiff and the station's audience. Within the first 56 minutes of his return broadcast alone, Sánchez reported receiving over 3,000 text messages from listeners, a figure that reflects the extraordinary and sustained level of public attention the incident continued to command nearly a month after it occurred.

64. The public apology, broadcast live on WKAQ 580 and reported across media outlets, did not erase Plaintiff's association with the offensive statements. To the contrary, it re-introduced and re-amplified that association before an even broader audience, ensuring that the reputational harm to Plaintiff would endure beyond the initial news cycle and continue to affect his professional standing, public image, and personal dignity on an ongoing basis.

**D. WAPA's Post-Incident Orchestrated Rehabilitation of Sánchez Compounded Plaintiff's Injury**

65. In the period following the incident, rather than allowing the controversy to subside, WAPA affirmatively used its broadcast platform to rehabilitate the public image of its employee Rubén Sánchez, the very individual who had publicly attacked Plaintiff, thereby compounding and prolonging the harm to Plaintiff.

66. Upon Sánchez's return to the air, WAPA permitted and facilitated a series of broadcasts in which Sánchez hosted and interviewed some of Puerto Rico's most prominent and respected public figures, including leading political officials, a member of the clergy, and other authorities widely regarded as credible and honorable.

67. By appearing as Sánchez's guests and engaging with him in a posture of normalcy and deference, these prominent figures lent Sánchez their own prestige and credibility, publicly signaling acceptance of him and effectively "washing off his face" (lavándole la cara) the controversy. The cumulative and intended effect of these broadcasts was to restore, and indeed to elevate, Sánchez's credibility, stature, and public respect in the wake of his own misconduct.

68. This rehabilitation of the aggressor operated to the direct and foreseeable detriment of Plaintiff, the recipient of the attack. As Sánchez's public standing was repaired and enhanced through WAPA's platform, the public perception of Plaintiff was correspondingly diminished, reinforcing the impression that the episode somehow reflected adversely upon Plaintiff rather than upon the man who had assaulted his honor on live air.

69. WAPA, which exercises control over the content, scheduling, and editorial direction of its broadcasts, made a deliberate choice to deploy its platform for the benefit of its own employee at Plaintiff's expense. In doing so, WAPA added insult to injury, deepening the reputational harm it had already caused and ensuring that the contrast between the rehabilitated aggressor and the diminished recipient of the attack would be impressed upon the public mind.

70. Sánchez's attack on Plaintiff was not an isolated aberration. Sánchez has a documented and well-known history of volatile, erratic, and aggressive conduct, including numerous prior public altercations, confrontations, and fights with colleagues, guests, and other individuals, both on and off the air.

71. This pattern of behavior has created a hostile and dangerous environment for those who appear at or work in WAPA's facilities, a risk of which WAPA has long been aware.

72. WAPA has knowingly permitted and maintained an unsafe environment at its premises and has failed to provide adequate premises security to protect the invited guests and personnel who lawfully enter its facilities, including Plaintiff.

73. Notwithstanding this knowledge, WAPA has taken no meaningful corrective or preventive measures to curb Sánchez's conduct or to guard against its recurrence. To the contrary, because Sánchez commands one of the largest audiences in the Puerto Rico radio market and generates substantial advertising and commercial revenue for WAPA, WAPA has chosen to tolerate and overlook his misconduct, prioritizing the profits he generates over the safety and dignity of the guests and personnel exposed to him, and demonstrating deliberate indifference to the foreseeable risk that he would again attack and injure another, as he did to Plaintiff.

## V. CAUSES OF ACTION

### COUNT I. Reputational Harm
### (Article 1536 of the Puerto Rico Civil Code of 2020 and Article II, Section 8 of the Constitution of Puerto Rico)

74. Plaintiff reasserts and incorporates by reference each of the foregoing allegations as if fully set forth herein.

75. Article 1536 of the Puerto Rico Civil Code of 2020, 31 L.P.R.A. § 10801, imposes civil liability upon any person who, through a culpable or negligent act or omission, causes damage to another. WAPA is liable under this provision both directly, for its own negligent acts and omissions, and vicariously under Article 1540, for the tortious conduct of its employee Rubén Sánchez, carried out on WAPA's premises, during WAPA's broadcast operations, and using

WAPA's credentials and facilities. Under vicarious liability, all conduct of Sánchez described herein is attributed to WAPA as a matter of law.

76. Article II, Section 8 of the Constitution of Puerto Rico expressly guarantees every person the right to protection of the law against abusive attacks on their honor, reputation, and private or family life. P.R. CONST. ART. II, § 8. *See* J. FARINACCI FERNÓS, LA CARTA DE DERECHOS 149 (noting that the framers of the Puerto Rico Constitution intended Section 8 to protect personal dignity and integrity in its most complete and expansive form).

77. Plaintiff's claim for reputational harm rests upon a well-established and independently cognizable legal interest. The Supreme Court of Puerto Rico has recognized that reputation constitutes an autonomous and intangible legally protected interest, one that the law safeguards as an inherent aspect of human dignity and personal identity, independent of and without regard to any other harm the injured party may have suffered. The right to one's reputation and good name is protected as a legal interest in its own right, deserving of full judicial vindication on its own terms. *See, e.g.*, *Cora v. GFR Media, LLC*, 2026 TSPR 58, at 16. The Supreme Court of the United States has similarly affirmed that the right of every person to the protection of their own reputation from unjustified invasion and wrongful hurt reflects no more than our most basic conception of the essential dignity and worth of every human being. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974). WAPA, through the conduct of its employee on its own broadcast platform, invaded this protected interest directly, publicly, and irreversibly.

78. As a direct and proximate result of the attack made by WAPA's employee Sánchez on WAPA's live broadcast, news of the incident spread virally through Puerto Rico's major media outlets, television channels, digital platforms, and social media networks. WAPA's own broadcast

signal was the vehicle through which these statements reached tens of thousands of listeners in real time, making WAPA a direct and foreseeable contributor to the harm that followed.

79. The dissemination of Sánchez's statements, and the public discourse, mockery, and spectacle they generated, thrust Plaintiff into a public projection that is humiliating, embarrassing, conflict-laden, and wholly inconsistent with the decades-long record of seriousness, professionalism, competence, and credibility he has built as a federal criminal defense attorney and recognized television and radio analyst. *See, e.g., Bosch v. Ed. El Imparcial, Inc.*, 87 DPR 285, 300 (1963)(a publication that tends to discredit, belittle, or dishonor a person, expose them to public hatred or contempt, or deprive them of public confidence and social standing is defamatory); *Weitz v. Green*, 230 P.3d 743, 754 (Idaho 2010) (explaining that a defamatory statement is one that harms a person's reputation by exposing the person to public contempt, disgrace, ridicule, or adverse effects on the person's business or profession). WAPA, which employed Sánchez, gave him unrestricted access to its broadcast facilities despite his known history of aggressive conduct, and whose live platform gave his statements immediate and irreversible mass reach, is directly responsible for this outcome.

80. The reputational harm suffered by Plaintiff is particularly acute and enduring in light of the digital environment in which the incident was disseminated. In the digital age, the reputation of individuals largely resides on the Internet, and for many professionals and public figures, Internet reputation is virtually all that matters. Once defamation takes hold on the Internet, it is extraordinarily difficult to contain or extinguish, as "the poisonous radiation continues to damage the plaintiff long after the fires from the original explosion are extinguished." R. SMOLLA, 2 LAW OF DEFAMATION § 9:34.50 (2d ed.)(internal citation omitted). The statements broadcast by WAPA's employee on August 29, 2025 did not remain within the confines of a single radio

broadcast, they ignited an immediate and self-sustaining cycle of digital reproduction across social media platforms, news websites, YouTube, and online forums, ensuring that Plaintiff's name and the offensive statements directed at him became permanently and inextricably linked in the digital record.

81. The reputational harm suffered by Plaintiff is objective and verifiable: (a) the incident, originating from WAPA's own broadcast, circulated extensively across all media platforms, reaching audiences far beyond those who witnessed the live transmission, (b) it generated public commentary that exposed Plaintiff to shame, humiliation, and degradation, associating his name and professional image, before a mass audience, with an episode of public disgrace entirely of Sánchez and Defendant's making, (c) Plaintiff's clients, colleagues, judicial officers, and the general public were exposed to content that irreparably altered their perception of him, and (d) Plaintiff suffered real, ongoing, and quantifiable damage to the professional reputation that constitutes the foundation of his legal practice and public standing. WAPA is answerable for each of these dimensions of harm.

**COUNT II. Intentional Infliction of Emotional Distress**
**(Article 1536 of the Puerto Rico Civil Code of 2020)**

82. Plaintiff reasserts and incorporates by reference each of the foregoing allegations as if fully set forth herein.

83. Article 1536 of the Puerto Rico Civil Code of 2020 provides the legal framework under which claims for infliction of emotional distress, both negligent and intentional, are cognizable and actionable under Puerto Rico law. *See Ojeda v. El Vocero de P.R.*, 137 D.P.R. 315, 323 (1994) (recognizing that a wrongful act can produce different types of consequential injuries, such as physical, moral, or economic harm suffered by the aggrieved person). The concept of fault under Article 1536, the successor to Article 1802 of the former Civil Code, is as

infinitely broad as human conduct itself, encompassing any failure of a person that produces harm or injury to another. *See Vigoreaux v. Quiznos*, 173 D.P.R. 254, 281 (2008). *See also* E. CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 1139 (6th Ed.)("Speech can be the basis for a claim for infliction of emotional distress").

84. WAPA is liable under two concurrent theories: (a) direct liability, for its own negligent acts and omissions that created the conditions under which the attack occurred and was broadcast to a mass audience, and (b) vicarious liability under Article 1540, as employer of Rubén Sánchez, whose extreme and outrageous conduct was carried out on WAPA's premises using WAPA's facilities within the scope of his employment.

85. The conduct giving rise to Plaintiff's emotional distress was extreme, outrageous, and made possible entirely by WAPA: WAPA employed Sánchez despite his documented history of aggressive behavior. WAPA issued the credentials he used to enter the live broadcast booth. WAPA failed to implement protocols preventing employees not involved in the active broadcast from entering an active studio during a live transmission. Finally, it was WAPA's broadcast signal that carried Sánchez's attack to tens of thousands of listeners in real time, transforming a workplace confrontation into a massively public and irreversible assault on Plaintiff's dignity and professional standing. *See Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993) (establishing the four elements of intentional infliction of emotional distress: (i) extreme and outrageous conduct, (ii) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress, (iii) a causal connection between the conduct and the injury, and (iv) resulting severe emotional distress). *See also* D. DOBBS, THE LAW OF TORTS § 385 (2001).

86. The conduct of WAPA's employee Rubén Sánchez meets every recognized marker of extreme and outrageous conduct: he abused his position as the station's dominant on-air

personality to publicly attack an invited guest. He acted with deliberate personal animus rather than any legitimate professional purpose. His conduct was not spontaneous but premeditated and repetitive, preceded by a hostile obscene gesture in the hallway, followed by a vulgar text message exchange, and culminating in the on-air attack, a sequence Plaintiff could not avoid given that he was live on air in an enclosed broadcast booth on WAPA's own premises. Finally, the attack was carried out through a live broadcast platform that ensured its instantaneous and irreversible dissemination to a mass audience beyond Plaintiff's control or ability to contain. This is precisely the type of conduct, *i.e.*, deliberate, repeated, inescapable, and publicly devastating, that goes beyond all bounds of decency tolerated in a civilized society and for which the law imposes liability. *See* D. DOBBS, THE LAW OF TORTS §386 (2001).

87. WAPA's direct negligence independently caused Plaintiff's emotional distress. WAPA had actual knowledge of Sánchez's prior hostile and aggressive conduct, yet retained him with unrestricted facility access, failed to supervise his movements on the morning of August 29, 2025, and took no preventive action despite the immediate warning signs preceding the attack, including Sánchez's obscene gesture toward Plaintiff in the station hallway on WAPA's premises minutes before the on-air incident.

88. As a direct and proximate result of WAPA's liability, Plaintiff has suffered and continues to suffer severe emotional distress, including: acute humiliation from being publicly insulted on live radio and having that humiliation amplified across all media platforms through WAPA's own broadcast reach, anxiety and mental anguish caused by the sudden, unprovoked, and deliberately public nature of the attack, the sustained distress of having his name and image permanently associated with a degrading public episode viewed and discussed by hundreds of thousands of people, and loss of enjoyment of professional and personal life, evidenced by being

approached and questioned about the incident for weeks and months afterward in numerous professional and personal settings.

89. WAPA's employee Sánchez acted willfully and maliciously. WAPA itself acted negligently and in reckless breach of its duty to Plaintiff as an invited guest on its premises. Their combined conduct directly and proximately caused Plaintiff's severe emotional distress, for which WAPA is fully liable. The willful and outrageous nature of Sánchez's conduct, and WAPA's gross negligence in enabling it, warrant both compensatory and punitive damages.

**COUNT III. Defamation**
**(Article 1536 of the Puerto Rico Civil Code of 2020 and Article II, Section 8 of the Constitution of Puerto Rico)**

90. Plaintiff reasserts and incorporates by reference each of the foregoing allegations as if fully set forth herein.

91. WAPA is liable for the defamatory statements described herein vicariously as employer of Rubén Sánchez under Article 1540, and directly as the licensed broadcast entity whose facilities and live transmission platform were the instrumentalities through which the defamatory statements were published to a mass audience. The element of publication was satisfied by WAPA itself: it was WAPA's broadcast signal that carried Sánchez's statements to tens of thousands of listeners in real time. Additionally, Article II, Section 8 of the Puerto Rico Constitution expressly provides that every person has the right to protection against abusive attacks on their honor and reputation, a fundamental right directly violated by the conduct for which WAPA is responsible. *See Pérez v. El Vocero*, 149 D.P.R. 427, 465 n.14 (1999) (noting that protection against defamatory expressions in Puerto Rico arises from Article II, Sections 4 and 8 of the Puerto Rico Constitution).

92. In a defamation action, the protected interest is the personal reputation of the publicly injured party, as the law recognizes each individual's right to defend his name and

standing before others. *Soc. de Gananciales v. El Vocero de P.R.*, 135 D.P.R. 122, 126-27 (1994) (recognizing the individual's right to protect his good name in the eyes of the public). Accordingly, the purpose of a defamation action is to compensate the party whose reputation has been wrongfully diminished. *Colón Pérez v. Televicentro de P.R.*, 175 D.P.R. 690, 712 (2009) (recognizing that the primary aim of a defamation claim is to compensate the reputational harm suffered by the injured party).

93. Under Puerto Rico law, defamation consists of the communication of false or injurious statements that tend to degrade a person, damage their reputation, or expose them to public contempt, ridicule, or hatred. *See Bosch v. Ed. El Imparcial, Inc.,* 87 D.P.R. 285, 300 (1963) (a publication that tends to discredit, belittle, or dishonor a person, expose them to public hatred or contempt, or deprive them of public confidence and social standing is defamatory); *Pérez v. El Vocero*, 149 D.P.R. 427, 442-43 (1999). Courts have consistently recognized that certain words are so inherently offensive, dishonorable, and degrading that their public utterance constitutes defamation by their very nature, not because of any implied factual assertion, but because of the contempt, humiliation, and reputational injury they inflict upon the person to whom they are directed. Words such as "pendejo", a vulgar epithet conveying stupidity, cowardice, and contemptible character, fall squarely within this category when shouted publicly at a professional of established standing before a mass audience, without provocation or justification. *See Rudin v. Dow Jones & Co., Inc.*, 510 F. Supp. 210, 213-16 (S.D.N.Y. 1981) (libelous to refer to a lawyer as a "mouthpiece," as the statement insinuated mob connections and portrayed plaintiff as an unprofessional attorney who lacked independent judgment); *Smith v. McMullen*, 589 F. Supp. 642, 645-46 (S.D. Tex. 1984) (reference to a former executive as a "despicable human being" held actionable per se); *National Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 741-42 (Minn. 1982)

(statement that a former employee was "nothing but a god damn loser, a no good son of a bitch" held defamatory as it disparaged plaintiff's professional character).

94. The statements broadcast by WAPA on August 29, 2025 constitute defamation because: (a) they consisted of objectively degrading, vulgar, and dishonoring language that, by its very nature, exposed Plaintiff to public contempt, ridicule, and reputational harm before a mass audience, (b) they carried the unmistakable public implication that Plaintiff had engaged in conduct warranting a confrontational, hostile, and demeaning rebuke by a colleague, an insinuation damaging to his character, professional standing, and public image, (c) they were directed at a prominent attorney, public analyst, and media figure before the very professional and public audience upon whose respect and confidence his career depends, and (d) they were not protected by any recognized legal privilege, journalistic function, or constitutional justification, having been made entirely outside the scope of any legitimate expressive activity.

95. A defamatory statement may injure reputation by impairing the plaintiff's favorable public image, an image that, in our modern cultural environment, constitutes a valuable personal asset, a springboard to influence and professional opportunity, and a commodity inextricably bound up in personal identity and self-worth. *See* R. SMOLLA 2 LAW OF DEFAMATION § 9:33 (2d ed.). Plaintiff's public image as a serious, credible, and respected attorney and media commentator is not incidental to his professional life. It is the foundation of it. The statements broadcast through WAPA's platform on August 29, 2025, attacked and degraded that image before tens of thousands of listeners, replacing decades of carefully built public credibility with the spectacle of a prominent professional being publicly humiliated on live radio by a colleague, a harm that is direct, concrete, and fully compensable under applicable law.

96. The injury inflicted by the defamatory statements is compounded by the context of their delivery. Unlike an insult made in private, Sánchez's statements were made on live radio, ensuring their immediate and irreversible dissemination to tens of thousands of listeners. They were subsequently reproduced, shared, and commented upon across every major media platform in Puerto Rico, exponentially amplifying their defamatory impact. A person of ordinary sensibility hearing a prominent attorney publicly called *"pendejo"* (asshole) on live radio by a colleague, without any stated justification, would reasonably conclude that the target of such language is a person of diminished character, poor judgment, or disreputable conduct, precisely the harmful impression that defamation law is designed to prevent and remedy.

97. Sánchez's conduct was intentional, premeditated, and motivated by personal animus toward Plaintiff, as evidenced by the prior obscene gesture in the station hallway, the hostile text messages using the same vulgar epithet, and the deliberate use of WAPA-issued credentials to gain access to the live broadcast booth for the sole purpose of publicly attacking Plaintiff. This course of conduct satisfies the actual malice standard applicable to public figures under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and for which WAPA is liable under vicarious liability. In the alternative, WAPA's retention of Sánchez despite knowledge of his prior aggressive conduct, and its failure to prevent his access to the live broadcast booth, constituted at minimum gross negligence.

98. In the internet age, the most harmful defamation is not confined to the moment of utterance. It is the kind that endures, embedding itself in a person's public image and poisoning search results long after the attack. To this day, anyone who searches Plaintiff's name online encounters, alongside decades of professional achievement, the permanent residue of an assault

that Sánchez delivered and that WAPA broadcasted and failed to prevent. This is an involuntary association that Plaintiff will bear unjustly and indefinitely, with no prospect of erasure.

99. By reason of the defamatory statements and the violation of Plaintiff's constitutional right to the protection of his honor under Article II, Section 8 of the Puerto Rico Constitution, Plaintiff is entitled to actual damages for reputational harm, economic loss, and emotional distress, damages for the constitutional violation of his fundamental right to honor independently of the tort claim, and punitive damages warranted by the willful, premeditated, and malicious nature of the conduct for which WAPA is responsible.

**COUNT IV. Direct Premises Liability for Damages Suffered by an Invitee**
**(Article 1536 of the Puerto Rico Civil Code of 2020)**

100. Plaintiff reasserts and incorporates by reference each of the foregoing allegations as if fully set forth herein.

101. This Count is asserted against WAPA on the basis of its own direct negligence as owner, operator, and licensee of the premises where the incident occurred, independent of and in addition to its vicarious liability under other Counts.

102. Puerto Rico law defines negligence as the failure to exercise due diligence to avoid foreseeable risks, and a defendant's prior knowledge of a dangerous condition or person renders the resulting harm presumptively foreseeable. *See Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc.,* 124 F.3d 47, 50 (1st Cir. 1997)("Puerto Rico law defines negligence as the failure to exercise due diligence to avoid foreseeable risks."); *Coyne v. Taber Partners I,* 53 F.3d 454, 457-60 (1st Cir. 1995)(establishing that the touchstone of a premises operator's duty to provide security consists in three elements: the special relationship between the establishment and its invitee, the operator's knowledge of incipient peril, and its ability to exercise a meaningful degree of control over the situation). Under Article 1536 of the Puerto Rico Civil Code of 2020, the successor to

Article 1802, a premises owner or operator owes a duty of reasonable care to invitees and is liable for all foreseeable harm resulting from a breach of that duty.

103. At the time of the incident, Plaintiff was lawfully present at WAPA's premises as a repeatedly invited professional guest, having appeared at those same facilities in that same capacity for approximately fifteen years. As such, Plaintiff was an invitee of the highest order to whom WAPA owed a heightened and non-delegable duty of care, including the obligation to protect him from the harmful and aggressive acts of WAPA's own employees.

104. WAPA had actual, institutional knowledge of Sánchez's pattern of erratic and aggressive conduct, including prior altercations with guests at the radio station. On the morning of August 29, 2025, WAPA was presented with an additional warning sign it ignored: Sánchez directed an obscene gesture at Plaintiff in the station hallway. WAPA took no action.

105. Notwithstanding this knowledge, WAPA failed to: (a) implement access control protocols preventing employees not involved in the active broadcast from entering an active broadcast booth during a live transmission, (b) supervise Sánchez's movements after his program concluded, with Plaintiff on air in an adjacent studio, (c) intervene upon observing Sánchez's hostile conduct toward Plaintiff in the hallway, and (d) take corrective action following previous altercations that would have prevented recurrence. These failures constitute independent and cumulative breaches of WAPA's duty of care under Articles 1536 and 1538 of the Puerto Rico Civil Code of 2020.

106. A direct and proximate causal nexus exists between each of WAPA's negligent omissions and the damages suffered by Plaintiff: had WAPA controlled access to the broadcast booth, Sánchez could not have entered. Had WAPA supervised Sánchez that morning, his escalating hostility would have been intercepted. Had WAPA acted on previous incidents, these

conditions would not have existed. WAPA is directly liable for the full measure of Plaintiff's reputational, economic, emotional, and dignitary damages, damages that were entirely foreseeable, entirely preventable, and entirely the product of WAPA's deliberate indifference to the safety of an invited guest on its premises.

**COUNT V. Vicarious Liability**
**(Article 1540, Puerto Rico Civil Code of 2020)**

107. Plaintiff reasserts and incorporates by reference all preceding allegations as if fully set forth herein.

108. Article 1540 of the Puerto Rico Civil Code of 2020, 31 L.P.R.A. § 10805, establishes that employers are liable for damages caused by their employees in the exercise of the functions for which they were employed. At all times relevant to this action, Rubén Sánchez was an employee of WAPA, acting under WAPA's direction and control, and using WAPA's premises, credentials, equipment, and broadcast platform in the performance of his duties.

109. The incident occurred: (a) on WAPA's premises, (b) immediately following Sánchez's own WAPA broadcast, during the same operational morning, (c) using WAPA-issued station credentials to gain access to the broadcast booth, and (d) on WAPA's live broadcast signal. The attack, while not authorized by WAPA, occurred within the general context of Sánchez's employment and was made possible entirely by the position, access, and platform that WAPA provided him.

110. In the alternative, even if Sánchez's conduct is deemed outside the strict scope of his employment functions, which Plaintiff denies, WAPA's liability nonetheless subsists on the grounds of: (a) negligent retention, having retained Sánchez despite actual knowledge of his history of aggressive conduct, and (b) negligent supervision, having failed to adequately supervise

his conduct on the morning of August 29, 2025, despite the foreseeable risk he posed to an invited guest on WAPA's premises.

111. In the further alternative, even if Sánchez were deemed an independent contractor rather than an employee of WAPA, which Plaintiff expressly denies, WAPA's liability would nonetheless subsist on independent grounds. Under Puerto Rico law, a principal who retains an independent contractor is liable for harm caused by that contractor where: (a) the principal retained control over the manner and means by which the work was performed, (b) the work was inherently dangerous or created a foreseeable risk of harm to third parties, or (c) the principal was independently negligent in selecting, retaining, or supervising the contractor. *See Pons v. Engebretson*, 160 D.P.R. 347, 358-59 (2003) (explaining that a principal avoids liability for an independent contractor's acts only upon a showing that the principal exercised due diligence in the hiring process and required the contractor to observe appropriate measures and special precautions). *See Martínez v. Chase Manhattan Bank*, 108 D.P.R. 515, 522-23 (1979) (imposing vicarious liability upon a principal for damages caused by an independent contractor where the nature of the work presented special or particular risks to third parties, recognizing that those who direct, control, and profit from operations carrying inherent risks to others cannot shed liability through the independent contractor designation).

112. WAPA, as Sánchez's employer, is jointly and severally liable for the full measure of damages caused by Sánchez's conduct, including reputational, economic, emotional, and dignitary damages, as well as punitive damages warranted by the willful and malicious nature of Sánchez's actions.

**COUNT VI. Joint and Several Liability of WAPA Holdings, InterMedia, and Other Defendants**
**(Articles 1536 and 1540, Puerto Rico Civil Code of 2020)**

113. Plaintiff reasserts and incorporates by reference all preceding allegations as if fully set forth herein.

114. Defendants WAPA Holdings and InterMedia, as the entities that own and control WAPA and the broadcast properties operated under the WAPA Media Group umbrella, as disclosed in the FCC Ownership Report, exercised or had the right to exercise control over the premises, personnel, credentialing, programming, and broadcast operations through which the acts and omissions described in this Complaint occurred, and profited from those operations, including the audience and advertising revenue generated by Rubén Sánchez. Each is jointly and severally liable to Plaintiff, under Articles 1536 and 1540 of the Puerto Rico Civil Code of 2020, for the full measure of the damages alleged herein, whether directly, vicariously, or under alter ego, single business enterprise, agency, or such other theories of liability as the facts confirmed through discovery may warrant.

115. To the extent discovery establishes the precise identity, role, and liability of Defendants ABC Corporation and John Doe, Plaintiff alleges that each of said defendants is a joint tortfeasor bearing independent and concurrent liability for the damages suffered by Plaintiff as described throughout this Complaint, and is jointly and severally liable therefor under Articles 1536 and 1540 of the Puerto Rico Civil Code of 2020.

116. To the extent discovery establishes the identity of Defendant Insurance Company XYZ and the existence of one or more insurance policies covering the acts, omissions, and damages described herein, Insurance Company XYZ is liable to Plaintiff for the full measure of damages recoverable under such policy or policies, up to the applicable coverage limits, whether issued in favor of WAPA, WAPA Holdings, InterMedia, ABC Corporation, Rubén Sánchez, John Doe, or any combination thereof.

117. Plaintiff reserves the right to amend this Complaint upon confirmation through discovery of the true names, identities, corporate forms, and precise roles of Defendants ABC Corporation, John Doe, and Insurance Company XYZ, and to assert such additional theories of liability as the facts confirmed through discovery may warrant.

## VI. DEMAND FOR JURY TRIAL

118. Plaintiff demands a trial by jury on all issues so triable.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Leonardo Aldridge respectfully requests that this Honorable Court grant the following relief:

(a) Enter judgment in favor of Plaintiff and against Defendants Televicentro of Puerto Rico, LLC, d/b/a WAPA TV and WAPA Media Group, WAPA Holdings, LLC, InterMedia Espanol, Inc., ABC Corporation, Insurance Company XYZ, and John Doe, jointly and severally, on all counts asserted herein.

(b) Award Plaintiff compensatory damages in an amount to be determined at trial, including damages for reputational harm, economic losses, emotional distress, mental anguish, and dignitary damages for the violation of Plaintiff's constitutional right to the protection of his honor and reputation under Article II, Section 8 of the Constitution of the Commonwealth of Puerto Rico, estimated in no less than $1,000,000.00.

(c) Award Plaintiff punitive damages in an amount sufficient to punish Defendant for the willful, malicious, and reckless conduct of its employee and to deter similarly situated licensed broadcast entities from tolerating, enabling, or failing to prevent such conduct in the future.

(d) Award Plaintiff pre-judgment and post-judgment interest on all damages at the maximum rate permitted by applicable law.

(e) Award Plaintiff his reasonable attorneys' fees, costs, and litigation expenses to the extent permitted by applicable law.

(f) Grant Plaintiff a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

(g) Grant such other and further relief as this Court deems just and proper.

**RESPECTFULLY SUBMITTED**.

**CERTIFICATE OF SERVICE**: We certify that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notice of such filing to all attorneys of record.

In San Juan, Puerto Rico, this 28th day of July, 2026.

*s/Guillermo Ramos-Luiña*
**GUILLERMO RAMOS LUIÑA**
USDC NO. 204007
E-mail: gramlui@yahoo.com

**Despacho Jurídico Ramos Luiña, LLC**
PO Box 22763
UPR Station
San Juan, PR 00931-2763
Tel. (787) 620-0527
Fax (787) 620-0039

**Baralt Law LLC**
PO Box 195103
San Juan PR 00919
(939) 625-3712

/s/Carlos R. Baralt Suárez
CARLOS R. BARALT SUÁREZ
USDC-PR No. 301510
E-mail: cbaralt@baraltlaw.com

*Counsels for Plaintiff*